IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BACHIR MIHOUBI,

    Plaintiff,

      v.

CARIBOU COFFEE COMPANY,
INC., et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:05-CV-2441-TWT

## ORDER

This is an employment discrimination action. It is before the Court on the

Defendants' Motion for Summary Judgment [Doc. 41].  For the reasons set forth

below, the Defendants' motion is GRANTED.

## I. BACKGROUND

Defendant Caribou Coffee Company, Inc. is the second largest gourmet coffee

operator in the United States.[1]  Defendant Michael Coles is Caribou's Chairman and

---

[1] Caribou's principal shareholder, both during and since the Plaintiff's employment, is an affiliate of Arcapita–a global investment group based in Bahrain that conducts its business in a manner consistent with the body of Islamic principles known as Shari'ah.  (Defs.' Mot. for Summ. J., at 3-4.)  For example, Shari'ah prohibits charging or collecting interest, as well as the sale of certain goods and services such as alcohol, gambling, pornography, and pork-related products.  (Id.)

CEO.  Caribou hired the Plaintiff, Bachir Mihoubi, on or about August 20, 2003, as its Vice President of Global Franchising.  Although Caribou is headquartered in Minneapolis, Minnesota, it allowed him to work from Atlanta and provided him with an administrative assistant.[2]  According to the Defendants, his primary responsibility in this role was "building global (domestic and international) relationships through franchise and joint venture opportunities and creating global alliances with strategic partners," including the selection of "target markets in Asia, Europe, the Middle East and North Africa."  (Coles Dep., Ex. 8.)  The Defendants contend that Caribou expected Mihoubi to "require relatively little advice and guidance," to work "largely ... independently," and to develop a five-year plan and budget for licensing opportunities within the first thirty days of his employment.  (Id.; Defs.' Mot. for Summ. J., at 7.)

Not surprisingly, the parties' evaluations of the Plaintiff's performance over the next two years differ greatly.  The Defendants contend that the Plaintiff grossly overstated his qualifications for this position and needed constant advice and guidance from Caribou management.  They also assert that he failed to create an acceptable business plan.  Coles further alleges that, in February 2005, he provided the Plaintiff

---

[2]According to the Defendants, every other senior executive at Caribou shared administrative assistants.  (McBride Aff. ¶ 13; O'Neil Aff. ¶ 23.)

with a negative annual review candidly expressing his displeasure that the Plaintiff had "oversold himself" because he "neither ha[d] the experience nor the capability to set-up the operational aspects of [Caribou's] licensing program, either domestically or internationally." (Coles Dep., Ex. 11; Mihoubi Dep., Ex. 96.)  This document was not signed by either Coles or the Plaintiff, however.

The Plaintiff argues that he was a stellar employee, that he never received this "Performance Review," and that prior to Spring 2005, no member of Caribou management had ever expressed any dissatisfaction with his performance.  He further contends that, following a presentation he gave shortly after his hiring, no one at Caribou ever requested that he produce a business plan until May 2005.  In support of his claim of stellar performance, he also points out that he was responsible for the biggest franchise deal in Caribou history, known as the Al-Sayer deal, which called for the opening of 250 stores throughout the Middle East.  As a result of this deal, he received a $100,000 bonus for the 2004 year, the second largest in the company and bested only by Coles himself.  Furthermore, another document entitled "Annual Performance Review" for 2004 shows that he received a "1B" rating, which Coles admitted was a "superstar" rating.  (Coles Dep., Ex. 12.)  This review was also unsigned.

In March 2005, Caribou promoted Amy O'Neil to Senior Vice President, a newly created position responsible for overseeing global licensing and training. O'Neil was thus directly supervising the Plaintiff, an additional supervisory layer that the Defendants claim was an "operational necessity due to its growing focus on global expansion and Plaintiff's continuing performance shortcomings." (Defs.' Mot. for Summ. J., at 9.) The Defendants contend that despite the Plaintiff's poor performance at this time, they continued to hope that he would grow into his senior executive position. On express directions from Coles, O'Neil thus immediately requested that the Plaintiff provide her with a three-year business plan.[3] She subsequently arranged for the Plaintiff to come to Minneapolis on May 4 and 5, 2005, to meet with her and Caribou's Director of Global Franchising Operations to work on this plan. The Defendants contend, however, that the Plaintiff came to this meeting completely unprepared and without the presentation materials O'Neil had requested. O'Neil further asserts that she counseled the Plaintiff at this time about his future at Caribou and inquired as to whether he might prefer a role strictly in sales. She claims that she assured him, however, that he was still a part of the Caribou family.

---

[3]Coles requested a five-year plan, but O'Neil reduced the time frame because she believed the last two years of such a plan were generally unhelpful. (O'Neil Aff. ¶ 33.)

The Plaintiff recalls this encounter quite differently.  He contends that O'Neil made no such assurance regarding his job security and that she consistently yelled at him and refused to allow him the opportunity to perform his presentation.  He thus concluded after this meeting that his poor treatment by O'Neil was the result of a discriminatory motive.  He then sent an email to O'Neil and Coles on May 11, 2005, stating as follows:

> I am distressed and disappointed by the recent turn of events, especially by the tactics used by caribou [sic] to force me [sic] or to demote me. Only recently you gave me high marks and rewarded me with a big bonus for my performance. Given the past behavior and the disparaging comments made by Caribou about people of my faith and national origin, the only conclusion I can reach is that these actions are motivated by discriminatory reasons.

(Mihoubi Dep., Ex. 122.)   The Defendants then contacted Caribou's Human Resources representative, Karen McBride, and she promptly initiated an inquiry into this charge of discrimination.[4]

---

[4]Both McBride and William Egan, the independent outside investigator hired by Caribou to investigate the Plaintiff's allegations, testified that they encountered resistance from the Plaintiff and his attorneys in pursuing his discrimination claims. (McBride Aff. ¶¶ 18-29; Egan Aff. ¶ 9.)  Egan states that Mihoubi and his attorneys insisted that he be interviewed in Atlanta even though he traveled to Minneapolis every other week for meetings.  The Plaintiff also refused to commit to a specific meeting date despite the numerous alternatives Egan provided him.  (Egan Aff. ¶ 9.) Egan was thus unable to complete his investigation and suspended it on August 19, 2005. (Id., Ex. 13.)

The Defendants claim that they continued to try and work with the Plaintiff on his performance problems.  O'Neil, Coles, and Caribou CFO George Mileusinic thus made a trip to Atlanta on June 7, 2005, in order for the Plaintiff to present the business plan that they contended was long overdue.  The presentation lasted only thirty minutes, however, and was, according to the Defendants, "a total waste of time." (Defs.' Mot. for Summ. J., at 16.)  The Plaintiff presented them only with a fourteen page PowerPoint presentation that relied heavily on market analysis performed by Starbucks Coffee to show Caribou's growth potential.  O'Neil, Coles and Mileusinic pointed out to the Plaintiff that this analysis was flawed because Starbucks had already established stores in these countries, whereas Caribou would be starting from scratch.

The Plaintiff counters that he constructed only a thirty minute presentation because, in his corporate experience, busy executives would not want to spend any longer than that listening to a business plan.  He further claims that at this meeting he was again "constantly yelled at and interrupted in an insulting manner, and effectively prevented from presenting his business plan."  (Mihoubi Decl., ¶ 22.)

O'Neil contends that, following this meeting, she began to give serious consideration to firing the Plaintiff.  Because she was still looking for a signal that he could turn things around, she urged him to focus his attention on a potential franchising opportunity for the opening of Caribou stores in Singapore, Malaysia and

Indonesia ("the Fong Tat deal").  The Plaintiff had obtained a Letter of Intent ("LOI")

for this deal in January 2005, but according to Caribou's attorney, Stuart Hershman,

as of June 23, 2005, there were still many details that needed to be provided before the

deal could be finalized.  O'Neil, Coles and Mileusinic thus asked the Plaintiff to do

a full blown presentation on this deal at a Senior Executive Meeting in Minneapolis

in mid-June.  On the day of the meeting, however, the Plaintiff emailed O'Neil and

informed her that he had to cancel the trip because he had an appointment for a non-

emergency medical problem.  The Defendants later determined that he had known

about this appointment for a week.  Because the Plaintiff failed to mail the deal

documents beforehand, moreover, the meeting could not be conducted by

teleconference and had to be rescheduled for June 22, 2005.

O'Neil contends that the Plaintiff arrived for the June 22 meeting woefully

unprepared with a presentation that lacked the requisite details or source information.

O'Neil thus instructed the Plaintiff to email Coles by 10:00 a.m. the next morning to

confirm that he understood the remaining issues with the deal and to estimate how

long it would take him to resolve these issues.  The Plaintiff failed to email Coles,

however, forcing Coles to send an email to him with the Fong Tat "to do" list.[5]

---

[5]The Plaintiff contends that this meeting was "bogus" because the Fong Tat LOI had already been signed.  (Pl.'s Resp., at 12.)

The Defendants also contend that the Plaintiff had become increasingly insubordinate by this time.  For example, in a June 13, 2005 memorandum sent to Coles, Mileusinic, O'Neil, and McBride, the Plaintiff accused Coles, O'Neil and Mileusinic of not acting "in the best interest of Caribou," "damag[ing] the reputation of the brand internationally," and negatively impacting Caribou's expansion progress. (Mihoubi Dep., Ex. 169.)  O'Neil claims that she decided in the first week of July that she had no choice but to fire the Plaintiff.  She waited until his next scheduled visit to Caribou headquarters on July 19, 2005, at which time his employment was officially terminated.  He was later replaced by an individual who is neither an Arab nor a Muslim.

On June 21, 2005, the Plaintiff filed an EEOC Charge alleging that he had been discriminated against based on his Muslim faith and his Algerian national origin.  His charge included allegations that Coles and other members of Caribou management had made repeated, offensive remarks disparaging the Islamic faith and individuals of Arab national origin.  He further alleged that Coles and other management members (1) expressed disdain at having to follow business practices in accordance with Shari'ah as required by Caribou's then Muslim ownership, (2) expressed happiness at the prospect of Caribou's imminent Initial Public Offering ("IPO") that would free the company from its Islamic ownership, and (3) embarked on a course of conduct

designed to force the Plaintiff out of the company because of his faith and national origin.  (Pl.'s Resp., Ex. 10.)  On December 29, 2005, the Plaintiff  amended his charge to include claims based on race and retaliation.  (Id., Ex. 11.)  Specifically, he alleged that his July 19, 2005 termination was a retaliatory act because it had occurred just a few days after the Defendants received notice of Mihoubi's EEOC charge.

The EEOC issued a two page determination in the Plaintiff's favor on April 3, 2007.[6]  (Id., Ex. 12.)  The decision apparently rejected the Defendants' argument that the Plaintiff had performed poorly, but discussed only Coles's alleged "Performance Review" from February 9, 2005, that contained several negative comments about Mihoubi's performance and abilities.  The EEOC noted that this review was unsigned by either Mihoubi or Coles, despite signature spaces provided at the bottom of the page for both the "VP" and the "Reviewer."   The determination further cited Mihoubi's denial that he had ever received this review and had instead received a $100,000 bonus and a 4.5% salary increase on March 4, 2005.  (Id.)  The EEOC also stated that the Plaintiff had been subjected to "numerous egregious disparaging remarks about his national origin and religion" and that nonparty sworn statements

---

[6]The Defendants point out that the EEOC initially issued a Notice of Right to Sue to the Plaintiff on September 29, 2006, with no finding of probable cause, but subsequently withdrew it. (Ryan Ferber Aff., Ex. A.) They contend this was done at the ex parte request of the Plaintiff's counsel.  (Id. ¶¶ 8-9.)

revealed a discriminatory attitude toward the Plaintiff by O'Neil because she "expressed views that she was not comfortable having someone from the 'Middle East' reporting to her" and "couldn't wait to get Muslim ownership behind the Respondent." (Id.)  The determination concluded that it was more likely than not that the Plaintiff was "subjected to harassment, treated differently and discharged due to his religion and national origin." (Id.) The Plaintiff then filed this Section 1981 action in this Court on September 9, 2005, alleging claims of discrimination, retaliation, and hostile work environment.  The Defendants have now filed a motion for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond

the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III. DISCUSSION

A. Discrimination

Section 1981 prohibits racial discrimination in the making and enforcement of private contracts.  42 U.S.C. § 1981.  Because claims brought under Section 1981 and Title VII of the 1964 Civil Rights Act[7] are analyzed under the same framework, these statutes have the same requirements of proof.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).  A plaintiff can establish a prima facie case of disparate treatment under Title VII with direct or statistical evidence, or he may use circumstantial evidence to satisfy the four-part test outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See also Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  Here, the Plaintiff claims summary judgment is unwarranted because he has presented both direct and circumstantial evidence of discrimination.  As an initial matter, the Court notes the Plaintiff's argument that the decision to terminate him was made by both Coles and O'Neil, despite the Defendants' contention that O'Neil acted alone in firing him.  The Court will assume for the purposes of this motion that it was a joint decision.

---

[7]42 U.S.C. § 2000e-1 *et seq*.

## 1. Direct Evidence

Direct evidence is such evidence that, if believed by the trier of fact, shows discrimination without any inference or presumption. Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997). If a plaintiff can present direct evidence of employment discrimination, the burden shifts to the defendant to prove, as an affirmative defense, that the decision would have been made anyway, despite the illegal discrimination. Cooper-Houston v. Southern Railway Co., 37 F.3d 603, 604 n.2 (11th Cir. 1994). To constitute direct evidence, however, the statement must have been made by a decision-maker and be related to the decision-making process with respect to the employee's termination. Standard, 161 F.3d at 1330; Evans v. McClain of Ga., Inc., 131 F.3d 957, 962 (11th Cir. 1997); see also Burrell v. Board of Tr. of Ga. Military Coll., 125 F.3d 1390, 1394 n.7 (11th Cir. 1997) (finding that, where an employer "makes a specific comment in relation to a specific job or promotion, we believe that the value of that comment as direct evidence is limited to a challenge to that specific job or employment decision"). Direct evidence, moreover, is composed of "only the most blatant remarks, whose intent could be nothing other than to discriminate" on the basis of some impermissible factor. Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989). Evidence that only suggests discrimination, or that is subject to more than one interpretation, is not direct evidence. Id.

The Plaintiff contends that several statements by O'Neil constitute direct evidence of discrimination.  He relies upon testimony from two former Caribou employees, Chris Toal and Thomas Berzinski, who assert that O'Neil made derogatory comments pertaining to Muslims and Arabs.  Specifically, Toal testified that in the summer or early fall of 2004,  O'Neil stated that she "couldn't wait to get the Muslim ownership [of Caribou] behind us," and that she "didn't want to be involved with these guys," referring to Muslims. (Toal Dep. at 27-30.)  Berzinski stated that in June 2004, before O'Neil became the Plaintiff's immediate supervisor, she told him that she "did not feel comfortable having someone like that reporting to her," referring to a person of Middle Eastern descent.  (Berzinski Dep. at 12-13; Pl.'s Resp., at 24.)

The Court finds, however, that such evidence alone clearly does not constitute direct evidence of discrimination. See Burrell, 125 F.3d at 1390.  In Burrell, a female executive sued her former employer for gender discrimination and retaliatory discharge.   The plaintiff alleged that one year before she was terminated, she requested a promotion from senior vice president to executive vice president. Id. at 1393.  In response, her supervisor had stated "that he wanted to hire a man for the position because too many women filled [the employer's] officer positions."  Id.  In holding that this statement did not constitute direct evidence of discrimination, the

Court of Appeals emphasized the distinction between evidence that proves the existence of a discriminatory motive and evidence which merely suggests it. Only the former constitutes direct evidence. Id. The Eleventh Circuit thus determined that the supervisor's statements were not direct evidence of discrimination.[8] See also Burney v. Rheem Mfg. Co., Inc., 196 F.R.D. 659, 666 (M.D. Ala. 2000) (finding that because a supervisor's discriminatory comment about keeping women out of an industry was completely unrelated to the decision making process for the at-issue position, it could not constitute direct evidence).

This Court concludes that because none of these proffered comments were specifically related to O'Neil's decision to terminate the Plaintiff, they cannot

---

[8]In analyzing Burrell, moreover, another court in this circuit more recently explained:

> The Eleventh Circuit ruled that the decisionmaker's comment [in Burrell] was not direct evidence of discrimination because it did not specifically address (nor was it made in the context of) plaintiff retaining her job with defendant. By definition, the comment was circumstantial evidence because the jury must infer that the decisionmaker's unwillingness to promote a female to executive vice president "meant that he also intended to later terminate female employees because they were female." Id. Hence, when a decisionmaker "makes a specific comment in relation to a specific job or promotion ... the value of that comment as direct evidence is limited to a challenge to that specific job or employment decision." Id.

Chambers v. Walt Disney World Co., 132 F. Supp. 2d 1356, 1364-65 (M.D. Fla. 2001) (quoting Burrell, 125 F.3d at 1393 n.7).

constitute direct evidence of discrimination.  Certainly, it requires a substantial inferential leap to connect Toal's testimony that O'Neil did not want to deal with Muslim ownership with her decision approximately one year later to fire the Plaintiff. Her alleged statement in June 2004 that she would not be "comfortable" having a Middle Easterner reporting to her similarly fails to correlate directly with her much later decision to fire him.   Accordingly, the Plaintiff must demonstrate his discrimination claim using <u>McDonnell Douglas</u>'s four-part analysis.

2. <u>Circumstantial Evidence</u>

A prima facie case based on circumstantial evidence is established where a plaintiff demonstrates that he: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by a person outside the protected class.  <u>Kelliher v. Veneman</u>, 313 F.3d 1270, 1275 (11th Cir. 2002).  A prima facie case raises the presumption of illegal discrimination. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981); <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).  The burden then shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the employment decision.  <u>See</u> <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802.  This intermediate burden is "exceedingly light." <u>Holifield v. Reno</u>, 115 F.3d 1555, 1564 (11th Cir. 1997).

Here, the Court finds that the Plaintiff has made a prima facie case of discrimination.  He is a Muslim and is of Algerian descent,[9] was qualified for his position, and was terminated and replaced by an individual outside of his protected class.   The Defendants, however, have come forward with legitimate, non-discriminatory reasons for this termination.  They cite his "increasingly unsatisfactory job performance, inability or unwillingness to improve irrespective of Caribou's repeated counseling and efforts to work with him, and blatant insubordination towards his immediate supervisor and Caribou's CEO."  (Defs.' Mot. for Summ. J., at 32.)

The Plaintiff thus must demonstrate that these reasons are mere pretext for discrimination.  Pretext may be demonstrated either through additional evidence showing "the employer's proffered explanation is unworthy of credence," Burdine, 450 U.S. at 256, or by relying  on the same evidence that comprised the prima facie case.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).  The Plaintiff must, however, be able to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs v. Plantation

---

[9]A person of Arab ancestry may sue under 42 U.S.C. § 1981 if he can prove discrimination based upon ancestry or ethnic characteristics.  Saint Francis College v. Al-Khazraji, 481 U.S. 604 (1987).

Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).   In reviewing a defendant's explanation, moreover, the Court cannot override an employer's legitimate business judgment in the absence of evidence of discrimination.  E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000) (stating that "in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law").   Indeed, once a defendant proffers a nondiscriminatory and legitimate reason for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable fact finder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual."  Chapman, 229 F.3d at 1037; accord White v. Verizon South, Inc., 299 F. Supp. 2d 1235, 1241 (M.D. Ala. 2003).

The Court finds that the Plaintiff has failed to provide any evidence sufficient to rebut the Defendants' allegations regarding his unsatisfactory job performance.  In attempting to do so, he first disputes the Defendants' contention that he performed poorly prior to 2005 by claiming that there is no evidence that any member of Caribou management expressed dissatisfaction with his performance prior to that time.  (Pl.'s Resp., Ex. 10.)  This is untrue, however, as the Defendants have produced an email from Coles to the Plaintiff from May 7, 2004, that makes explicit many of the Defendants' proffered concerns about the Plaintiff's work performance.  Coles states:

It is clear to me you have never been in a position like this before in which you have full responsibility of the franchise area of a company. I will not spend anymore time explaining what the scope of that responsibility is, but I will say that I have never asked for anymore from you than that which is commensurate with your position.  There is no officer in this company that I have tried to help more, or have given more guidance and patience.  I expected a lot more depth and a lot more knowledge of the functionality of this department.

I will state it one more time, but it is the last time, I am here to help you be successful, but you are going to have to take responsibility for your actions.

(Mihoubi Dep., Ex. 85.)  Coles also mentions the Plaintiff's failure to produce a business plan, stating, "[i]t is your responsibility, when you are asking the members of this team to spend hours creating a business plan, which you are incapable of doing without them, [to ensure] that they are using the right set of facts."  (Id.)

Many of these same concerns are expressed in Coles's February 9, 2005 "Performance Review."  (Id., Ex. 96.)  Specifically, Coles wrote: "Bachir oversold himself.  He neither has the experience, nor the capability to set-up the operational aspects of our licensing program, either domestically or internationally....[he] does not have a disciplined approach.  He needs to focus more directly and less generally...."  (Id.)  The Plaintiff claims, however, that he never received or even saw this document and contends that his 2004 year-end review with Coles contained no negative commentary on his performance.  (Pl.'s Resp., at 36.)  He further points out that Coles gave him a $100,000 bonus and a rating for the 2004 year of "1B", which Coles

admitted was a "superstar" rating.  (Coles Dep. at 175; Ex. 12.)  The Plaintiff concedes, however, that this bonus was less than a third of the amount that he had both requested and believed was commensurate with his achievement.  (Mihoubi Dep. at 201-02.)

Even assuming that the Plaintiff was performing adequately prior to March 2005, however, the Defendants have presented ample evidence to demonstrate a decline in his performance in the subsequent months.  Where an employer provides legitimate reasons for more recent negative reviews, mere evidence of past good performance does not demonstrate that the employer's legitimate non-discriminatory reasons cannot be believed.  See Erickson v. Farmland Indus., Inc., 271 F.3d 718, 729 (8th Cir. 2001) (stating that "[a]n employer may choose to rely on recent performance more heavily than past performance"); Roberts v. Separators, Inc., 172 F.3d 448, 453 (7th Cir. 1999) (concluding that a single positive review and raise ten months prior to the adverse action does not indicate pretext in the face of evidence that the employee had a bad attitude on a number of specific instances occurring after the raise and review); see also Fasold v. Justice, 409 F.3d 178, 192 (3d Cir. 2005) ("Evidence of previous positive performance reviews does not prevent Appellees from considering the opinions of those who have expressed a negative view of Fasold's work.").

Here, the Defendants cite several examples to demonstrate the Plaintiff's inadequate performance in the months leading up to his termination.  First, both Coles and O'Neil testified that the Plaintiff continually failed to produce a business plan and that the one he finally presented was woefully inadequate.  (Coles Dep. at 133; O'Neil Aff. ¶ 35.)   O'Neil testified that she arranged for Mihoubi to meet with her in Minneapolis on May 4 and 5, 2005, to work on his three-year business plan, but that he showed up "completely unprepared and without the presentation materials or handouts that I had requested on May 3, 2005."  (O'Neil Aff. ¶¶ 37-38; Ex. 1.)  She claims that she counseled him on his failure to produce a business plan, and in response he asked her "how do I do it?"  (Id. ¶ 41.)  While the Plaintiff denies ever asking for help, a June 2, 2005 email from O'Neil to the Plaintiff, ostensibly in response to an inquiry by the Plaintiff, states, "sorry I could not get back to you earlier, yesterday I was swamped.  Unfortunately, I do not have a business plan to give you.  Although, I'm not sure how that would be applicable to your Franchise plan." (Mihoubi Dep., Ex. 162.)  Furthermore, when Coles, O'Neil and Mileusinic flew down to Atlanta on June 7, 2005, to hear his business plan, it is undisputed that it consisted of only a fourteen page PowerPoint presentation that lasted thirty minutes. O'Neil has stated that this was far from an adequate amount of time to present such a comprehensive business plan.  (O'Neil Aff.  ¶¶ 48-51.)  Moreover, the Plaintiff's

presentation relied heavily on market analysis performed by Starbucks to show Caribou's growth potential.  (Mihoubi Dep., Ex. 78.)  The Defendants pointed out that this analysis was fundamentally flawed because Starbucks already had an established presence in these countries, whereas Caribou would be starting from scratch, but the Plaintiff refused to admit his mistake.  (O'Neil Aff. ¶ 50.)

The Plaintiff's position appears to be that because no one at Caribou held his level of knowledge and expertise in the arena of international franchising, they failed to recognize what a stellar job he was doing.  He explicitly states that "neither Mr. Coles nor anybody else at Caribou was objectively qualified to judge my performance with respect to starting up Caribou's international franchising effort." (Mihoubi Decl., ¶ 4.)[10]  He also points out that Coles had experience only with domestic franchising and that "[i]nternational franchising is very different from domestic franchising, and experience regarding domestic franchising is not necessarily applicable to international franchising."  (Pl.'s Resp., at 4.)  Furthermore, in rebuttal of O'Neil's criticism of his abbreviated business plan at the June 7 meeting, he claims that in his experience, busy corporate CEO's and executives did not have time to hear anything more than a half hour presentation.  (Mihoubi Decl., ¶ 21.)  The Plaintiff thus implies

---

[10]During his deposition, he even went so far as to say that there was "nothing that Caribou could have taught me in franchising."  (Mihoubi Dep. at 126.)

that the Caribou executives' ignorance of international franchising precluded them from being able to assess accurately his performance.   The Eleventh Circuit has emphasized, however, that "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." Chapman, 229 F.3d at 1030.   An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 n.3 (11th Cir. 1999).   Whether or not the Defendants had good reason to believe that the Plaintiff was performing poorly is thus irrelevant to the Plaintiff's discrimination claim unless he can show that they did not truly believe in this reason.        As a factual matter, moreover, the evidence demonstrates that the Plaintiff was incorrect in his assessment of certain matters related to his franchising efforts.  The Plaintiff describes a meeting held on June 22, 2005, to discuss the Fong Tat deal as "bogus" because Coles had already received "all of the necessary financial information and had approved the letter of intent for the Fong Tat Group in January 2005." (Pl.s' Resp., at 12.)    However, the Plaintiff himself had previously acknowledged his understanding that an LOI is "always negotiable."   (Mihoubi  Dep., Ex. 85.) Furthermore, Caribou's franchise attorney has testified that he reviewed the Plaintiff's due diligence materials on June 22 and 23 and found that they did not "adequately

connect the relevant parties identified." (Hershman Aff. ¶ 13.)  In a June 23 email to Coles and O'Neil, moreover, he pointed out several key omissions that required correction before the deal could be completed.  (Id., Ex D.)  Most serious was the documents' failure to identify sufficiently who the people were behind the Fong Tat Group and whether they had the financial and operational capacity to fulfill their proposed contractual obligations. Therefore, regardless of whether an LOI had been signed in January, the Defendants have provided evidence that issues related to this deal remained unresolved at the time of this June 2005 meeting.

The Court also notes that despite requests for a coherent business plan that he concedes began at least by May 2005, the Plaintiff has produced no evidence that he created anything other than a PowerPoint presentation.  He offers nothing besides his own testimony to justify why this was sufficient.[11]  The Plaintiff's self-serving self-assessment that he was doing a great job and that his employer lacked the ability to recognize it is insufficient to combat the Defendants' evidence.  See Gustovich v. AT & T Commc'ns, Inc., 972 F.2d 845, 848 (7th Cir. 1992) ("An employee's self-serving statements about [her] ability ... are insufficient to contradict an employer's negative

---

[11]Although the Plaintiff makes reference to a "voluminous," two-hour presentation he made when he first started at Caribou, (Mihoubi Dep. at 146; Mihoubi Decl., ¶ 9), he fails to identify the location of this presentation in the record.  (Pl.'s Resp., at 5.)

assessment of that ability.").  Given the repeated documented requests by Coles and

O'Neil for the Plaintiff to produce a business plan and the Plaintiff's failure to

comply, the Court finds that the Plaintiff's testimony fails to establish any

incoherency or inconsistency in this proffered reason for his termination.

Furthermore, the Court finds insufficient evidence to demonstrate that the

decision to fire the Plaintiff related to his ancestry or ethnic characteristics.  The

Plaintiff's evidence includes the following:  First, as previously discussed, O'Neil

allegedly made several comments that she would be uncomfortable having someone

from the Middle East report to her.  (Berzinski Dep. at 12-13.)  The Plaintiff is of

North African descent. The Plaintiff also testified as to several instances in which

Coles engaged in anti-Muslim statements or conduct.  Specifically, the Plaintiff

recounted an incident in which he offered to write a card in Arabic for Coles to send

to an executive at Arcapita to celebrate a Muslim holiday.  In response, Coles

allegedly stated that he "couldn't believe he was lowering himself 'to this level.'"

(Pl.'s Resp., at 32.)[12]  The Plaintiff contends that Coles was not joking about this and

that it was the biggest shock of the Plaintiff's life.  (Mihoubi Dep. at 155-56, 158.)

The Plaintiff also testified that on several different occasions Coles ridiculed the

---

[12]Coles contends that he was concerned about sending this card because he could not write in Arabic and did not want his gesture to be misinterpreted by the Arcapita senior executive.  (Coles Dep. at 222-23.)

clothing Arabs wore and the rules Caribou was required to follow in accordance with Shari'ah.   (Id., at 159-60, 163-64.)   Toal testified that Coles made derogatory statements about Arabs and Muslims and that when O'Neil said that she could not wait to put Muslim ownership of Caribou "behind us," Coles did not chastise or reprimand her for making this statement.  (Toal Dep. at 30-31.)

What the Plaintiff appears to be claiming, in essence, is that these comments demonstrate a discriminatory atmosphere at Caribou sufficient to create an inference that his firing was pretextual. See, e.g., Asmo v. Keane, Inc., 471 F.3d 588, 595 (6th Cir. 2006) ("Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff."); Antol v. Perry, 82 F.3d 1291, 1302 (3d Cir. 1996) (stating that evidence of a hostile atmosphere can be used by the factfinder to determine pretext); Perdomo v. Browner, 67 F.3d 140, 146 (7th Cir. 1995) (holding that a trier of fact may infer discrimination from evidence that an EPA supervisor dined only with his Caucasian section chiefs and assigned all the Hispanic attorneys to the section with the Hispanic chief). The Eleventh Circuit has also previously discussed on several occasions the evidentiary value of an employer's past discriminatory statements in demonstrating pretext.   See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004) (concluding that an employer's

statement that "women aren't typically in that type of position" could allow a reasonable factfinder to infer discriminatory animus); Horne v. Turner Const. Co., 136 Fed. Appx. 289, 293 (11th Cir. 2005) ("Turner employees...testified that women should not do strenuous work and that women are better suited for cleaning work. Evidence of their attitudes is probative of pretext..."); Jones v. Bessemer Carraway Medical Center, 151 F.3d 1321, 1323 (11th Cir. 1998) ("Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case."); Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988) (allowing evidence of racial slurs to demonstrate pretext).

Discrimination lawsuits require a case-by-case approach, however, in which a court examines the entire record "to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Cross v. New York City Transit Auth., 417 F.3d 241, 249 (2d Cir. 2005) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).  Indeed, in Wilson, 376 F.3d at 1079, it was not discriminatory animus alone that permitted the plaintiff to avoid summary judgment.  The Eleventh Circuit noted evidence of a supervisor's admission that the plaintiff was the "most qualified" and "the obvious choice," accompanied by some evidence of discriminatory

animus, was sufficient to allow a reasonable factfinder to conclude that the supervisor did not think the male candidate was more qualified than the plaintiff.  Id. at 1091. Here, by contrast, general discriminatory statements are the sum of the evidence against Caribou and there is significant countervailing evidence that the Plaintiff was performing poorly at the time of his termination.  The Court thus finds that no genuine issue of pretext exists here and grants the Defendants' motion for summary judgment on this claim.[13]

B. Hostile Work Environment

The Plaintiff also claims that the conditions of his employment at Caribou constituted a hostile work environment.   In order to sustain a hostile work environment claim, an employee must show that: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of employment; and (5) the employer was responsible for the environment by vicarious or direct liability.  Miller v. Kenworth of Dothan,

---

[13]The Defendants also claim that the Plaintiff was fired for insubordination, specifically "incendiary memoranda" he sent on June 13 and July 18, 2005. (Defs.' Reply, at 20.)  The Plaintiff counters that these communications constitute protected activity as a matter of law.  Because the problems with the Plaintiff's performance constituted a legitimate reason to terminate his employment, the Court need not address whether these claims of insubordination were also a legitimate grounds for his firing.

Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  Here, the Plaintiff alleges first that Coles and other members of upper management expressed their disdain at having to follow particular business practices in accord with Shari'ah principles and expressed happiness at the prospect of freeing themselves from the current Islamic ownership through an IPO.  (Pl.'s Resp., Ex. 10; Toal Dep. at 27-28.)  The Plaintiff testified that Coles made fun of the Arab rules Caribou was required to follow in at least five of the twenty executive meetings he attended at Caribou.   (Mihoubi Dep. at 163-64.) Second, the Plaintiff cites Coles's previously discussed statement that he could not believe he was lowering himself "to this level" in response to the Plaintiff's suggestion that Coles send a card in Arabic.  (Id., at 154.)  Third, Coles's allegedly commented during a trip to Bahrain on the "funny" dress and that the men were dressed "strange[ly]" and later repeated this statement to employees at a meeting in the United States. (Mihoubi Dep. at 159-60; Toal Dep. at 33.)  Fourth, Vice President of Commercial Sales Henry Stein supposedly equated Muslims and Algerians "with being terrorists" and further asked the Plaintiff whether he "was getting organized to set up a terrorist team." (Mihoubi Dep. at 337, 339-40.)  Finally, Vice President of Research & Development Eddie Boyle allegedly referred to the Plaintiff as a "towelhead" on several occasions. (Id. at 337-40, 339-40.)

The Court finds, however, that the Plaintiff has not demonstrated by these isolated incidents that this harassment was unwelcome or sufficiently severe or pervasive to alter the terms of his employment.  In order to demonstrate that statements are unwelcome, an employee must make co-workers and superiors aware of his sentiments.  See Mangrum v. Republic Industries, Inc., 260 F. Supp. 2d 1229, 1253 (N.D. Ga. 2003) (finding "no evidence that Plaintiff, at any time, let [her supervisor] know that his sexual banter was unwelcome"); Balletti v. Sun-Sentinel Co., 909 F. Supp. 1539, 1547 n.6 (S.D. Fla. 1995) ("At some point, however, a plaintiff must show that she clearly made her co-workers aware that such conduct would be considered unwelcome."); Weinsheimer v. Rockwell Intern. Corp., 754 F. Supp. 1559, 1564 n.12 (M.D. Fla. 1990) ("Plaintiff simply must show that at some point she clearly made her co-workers and superiors aware that in the future such conduct would be considered 'unwelcome.'").  Here, despite the fact that many of these comments took place in mid-2004 or earlier, the Plaintiff failed to complain or indicate his disapproval of any of these statements or conduct prior to May 2005. (Mihoubi Dep. at 153.)  The Plaintiff also admitted that he had joked about certain countries' interpretation of Islamic law and made self-deprecating jokes about Algerians being thieves and complying with Islamic law only to gain a financial advantage.  (Mihoubi Dep. at 171-74.)

The Court also finds that the Plaintiff's claim fails to meet the severity requirement.  In evaluating the objective severity of the harassment, a court must consider: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Miller, 277 F.3d at 1276; see also Rojas v. Florida, 285 F.3d 1339, 1344 (11th Cir. 2002) (stating that to constitute a hostile work environment, the conduct must be so severe or pervasive that "the workplace is permeated with discriminatory intimidation, ridicule, and insult..."). Such an examination requires the court to consider this conduct "in context, not as isolated acts," and to make a determination based on "the totality of the circumstances." Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc).  Indeed, the Eleventh Circuit recently emphasized that:

> Although we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute [racial] harassment, the statements and conduct must be of a [racial] nature ... before they are considered in determining whether the severe or pervasive requirement is met." Gupta v. Florida Board of Regents, 212 F.3d 571, 583 (11th Cir. 2000)). "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." Id. Additionally, teasing, offhand comments, and isolated incidents (unless extreme) will not amount to discriminatory changes in the terms and conditions of employment. Mendoza v. Borders, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).

Robinson v. LaFarge North America, Inc., 2007 WL 1748109, at *4 (11th Cir. June 19, 2007).  Here, the Court notes, as an initial matter, that Coles's statement regarding the Muslim holiday card and his comment that Middle Easterners dressed "funny" or "strange[ly]" are of questionable evidentiary value because they were not directed at the Plaintiff.  Although it was the Plaintiff's interpretation that Coles's reluctance to sign the card indicated that he was lowering himself by sending it, Mihoubi's testimony attributes Coles only with the statements "I have never thought that I would get to this level" and "I can't believe I'm doing this." (Mihoubi Dep. at 154-55.) Coles has explained that he made this statement because he obviously did not know how to write in Arabic and was concerned his gesture would be misinterpreted. (Coles Dep. at 222-23.) The Court finds that these statements did not objectively indicate an environment  disparaging to Muslims or Middle Easterners.  See Borden, 195 F.3d at 1248 (concluding that a supervisor's comment that he was "getting fired up," did not objectively indicate a sexual or gender-related connotation).  A statement that citizens in Bahrain dressed strangely similarly lacks an objectively discriminatory character.

Furthermore, even considering all these allegations in aggregate, the Court does not find that these infrequent, isolated statements occurring over the course of two years of employment could establish a hostile work environment.   None were

physically threatening or unreasonably interfered with the Plaintiff's job performance. The Court is left to question, moreover, whether Stein or Boyle's comments are even a part of the Plaintiff's claim since his opposition brief fails to mention, much less discuss, these allegations.  Accordingly, the Court concludes that this evidence simply cannot create a genuine issue of material fact on whether the hostile work environment standard has been met.  This claim therefore fails.

C. Retaliation

To prove retaliation, a plaintiff must demonstrate that (1) he engaged in a statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal link exists between these two events.  Stavropoulos v. Firestone, 361 F.3d 610, 616 (11th Cir. 2004).  The parties dispute whether the Plaintiff can demonstrate a causal link between his May 11, 2005 internal complaint or June 29, 2005 EEOC Charge and ultimate termination on July 19, 2005.  The Plaintiff contends that the causal link has been demonstrated because O'Neil did not make the decision to fire him until after she became aware of his EEOC charge.  O'Neil has testified, however, that she decided to fire him in the first week of July, before she could have learned about the EEOC proceeding.[14]  Furthermore, close temporal proximity between a

---

[14]The Defendants have provided uncontroverted testimony that because the Plaintiff listed his Atlanta office on the EEOC charge as Caribou's place of business and the EEOC did not mail this charge to Coles at that address until Friday, July 8,

protected activity and an adverse action does not necessarily demonstrate a causal link where the employer provides a legitimate non-discriminatory reason for the employee's termination.  Robinson v. AFA Service Corp., 870 F. Supp. 1077, 1085 (N.D. Ga. 1994).  "Were the rule otherwise, then a disgruntled employee, no matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint."  Id. (quoting Mesnick v. General Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991)).  Here, the Plaintiff concedes that he knew as early as April 2005 that his job was in jeopardy.  (Mihoubi Dep. at 303, 307, 315-16.)  Based on the previously discussed legitimate reason for the Plaintiff's termination, the Court finds that he has failed to demonstrate a causal link.  Even if he could make such a demonstration, moreover, he has not shown that the Defendants' reason was mere pretext for retaliation.  See E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000); Robinson, 870 F. Supp. at 1085.  For these reasons, summary judgment for the Defendants is appropriate.

2005, the earliest O'Neil could have learned of it was Monday, July 11.  (McBride Aff. ¶ 33; Ex. 9.)

D. Individual Claims Against Coles

The Defendants have also moved for summary judgment on the claim that Coles is individually liable for his involvement in these discriminatory actions. The Plaintiff has failed to respond, indicating that he does not oppose this motion and has chosen to abandon this claim. See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). Furthermore, because the Defendants have provided a legitimate, non-discriminatory reason that was not pretextual, no claim can proceed against Coles. Accordingly, the Court finds that summary judgment for Coles is warranted.[15]

---

[15]The Court notes, finally, the Plaintiff's contention that because the EEOC determined that it was more likely than not that he had suffered harassment, discrimination and retaliation, a genuine issue exists on all these claims. (Pl.'s Resp., at 19-21; Ex. 12.) In the Eleventh Circuit, this argument is generally rejected. See Henderson v. Waffle House, Inc., 2007 WL 1841103, at *3 (11th Cir. June 28, 2007) (determining, in spite of the EEOC's for cause determination in favor of the employee, that the trial court had not erred in concluding that the plaintiff had failed to establish a prima facie case of harassment or retaliation); Kincaid v. Board of Trs., 188 Fed. Appx. 810, 817 (11th Cir. 2006) ("We are unpersuaded by Kincaid's contention that the EEOC determination raised a genuine issue of material fact regarding his claims of discrimination."); Dorsey v. Atlanta Cmty. Food Bank, 2007 WL 788936, at *3 n.6 (N.D. Ga. 2007) (stating that an EEOC determination letter "is not a substitute for the well-established analytical framework applicable to ADA claims, and it is not sufficient evidence, in and of itself, to survive a properly supported motion for summary judgment"); Assily v. Tampa Gen. Hosp., 814 F. Supp. 1069, 1071 (M.D. Fla. 1993) ("[I]t is within this Court's discretion to determine how much weight to afford the EEOC's Determination of reasonable cause."). Here, the EEOC's two page

IV. <u>CONCLUSION</u>

For the reasons set forth above, the Defendants' Motion for Summary Judgment

[Doc. 41] is GRANTED.

SO ORDERED, this 9 day of August, 2007.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

---

determination letter, moreover, is largely conclusory and fails to discuss any of the evidence demonstrating the Plaintiff's poor job performance other than the February 9, 2005 "Performance Review," which the EEOC discounts because it is unsigned. The determination also concludes that the Plaintiff was subjected to "numerous egregious disparaging remarks about his national origin" without offering any discussion as to the substance of these remarks. (Pl.'s Resp., Ex. 12.)  The Court has considered all the evidence in the record, including this EEOC determination, and finds that no genuine issues of fact exist in this case.